*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SHARON THOMPSON, | ) | |
| | ) | Supreme Court No. S-17262 |
| Appellant, | ) | |
| | ) | Superior Court No. 3NA-17-00007 CI |
| v. | ) | |
| | ) | O P I N I O N |
| EVERETT THOMPSON, | ) | |
| | ) | No. 7421 – November 29, 2019 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Naknek, Christina Reigh, Judge.

Appearances: Jacob A. Sonneborn, Law Office of Jacob Sonneborn, Anchorage, and A. William Saupe, Ashburn & Mason, Anchorage, for Appellant. Kara A. Nyquist, Anchorage, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

CARNEY, Justice.

## I.      INTRODUCTION

A divorced wife challenges the superior court's child custody determination, marital property division, and child support order. Because we conclude that the court neither clearly erred nor abused its discretion when it awarded joint legal and shared physical custody, we affirm the custody determination. But we vacate and remand the child support order because it does not include sufficient findings to support

the calculation of the parents' income. And we vacate and remand the property division because the court improperly separated a fishing vessel from the rest of the marital estate. Finally, we vacate and remand the attorney's fees award for consideration in light of the court's recalculation of the marital estate and the parties' incomes.

## II.  FACTS AND PROCEEDINGS

### A.  Facts

Sharon and Everett Thompson married in 2011. They have two minor children, a son born in 2011 and a daughter born in 2015.

Everett is a commercial fisherman living in Naknek. He owns two fishing vessels, one of which he purchased and fully paid off before he and Sharon married; the second vessel, the F/V NORTHERN FLYER, was purchased during the marriage.

Everett and Sharon began dating in 2010; soon afterward Sharon moved into Everett's home, which he had purchased in 2001, and which is situated on a Native allotment that cannot be transferred to a non-Native buyer.[1] Although she worked in various jobs before they married, Sharon stayed home with the children during much of the parties' marriage. In financial documents filed in superior court Sharon indicated her primary occupation was film production.

### B.  Proceedings

In April 2017 Sharon filed for divorce, seeking primary physical and sole legal custody of their children. Everett answered the following month, asserting that he should have sole legal and primary physical custody as well as interim possession of the marital home. Sharon and Everett negotiated an interim custody agreement, which the

---

[1]  *See* former Alaska Native Allotment Act, 43 U.S.C. §§ 270-1 to 270-3 (repealed 1971); *see also* 43 U.S.C. § 1634(a)(1) (2012) (providing for approval of allotment applications still pending upon repeal of Alaska Native Allotment Act and passage of Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601-1629h (2012)).

court approved in December 2017. Their agreement provided for joint legal custody and established a schedule for alternating physical custody every two days.

### 1. Hearings relevant to custody determination

#### a. January 2018

In mid-January 2018 Sharon petitioned for ex parte domestic violence protective orders against Everett on behalf of herself and the children.[2] She alleged that she had reason to believe their daughter may have been sexually abused while in Everett's custody, though she did not allege that Everett had committed sexual abuse; Sharon also alleged Everett had verbally and emotionally abused her. The court granted Sharon a short-term protective order against Everett and granted her temporary custody of the children. But the court did not issue protective orders on behalf of the children, as it found Sharon had not established probable cause that Everett had committed a crime of domestic violence against them.[3]

Everett moved to modify the temporary custody order, under which his visits with the children had to be supervised. He sought to return to the alternating custody schedule in the parties' interim custody agreement.

A hearing was held over January 24 and 25 on Everett's modification motion. Sharon and Everett agreed that the children had been in Everett's custody until he had dropped them off at daycare on the morning of January 8, after which Sharon's two days of custodial time started. Sharon testified that later on January 8 she had observed that their daughter had unusual vaginal discharge and "a bright red . . . nick"

---

[2]       *See* AS 18.66.110 (governing ex parte and emergency protective orders).

[3]       *See* AS 18.66.110(a) (providing court shall issue ex parte protective order if it finds that petition "establishes probable cause that a crime involving domestic violence has occurred" and order is "necessary to protect the petitioner from domestic violence").

on her genital area. Sharon had taken her to a health clinic in Naknek the following day for an examination, which revealed a three-millimeter laceration near the girl's vaginal opening. Sharon also testified that shortly afterward she took the child to Dillingham for a more thorough examination at a Child Advocacy Center (CAC), including swabs for DNA and sexually transmitted infections.[4] Everett testified that he had supervised the children during his custodial time and that "nothing happened in [his] care"; he suggested that the girl's symptoms could have been caused by a yeast infection or by her accidentally scratching herself. The court restored Everett's unsupervised visits with the children, but allowed Sharon to retain temporary custody for the duration of the short-term protective order.

The court held a hearing on Sharon's request for long-term protective orders on January 30, 2018. Sharon reiterated what she had observed on her daughter on January 8 and 9; Everett expressed skepticism that the symptoms were the result of sexual abuse. The court denied long-term protective orders for Sharon and the children, finding that Sharon had not established by a preponderance of the evidence that Everett had committed an act of domestic violence against any of them.

### b.     June 2018

In late May 2018 Sharon moved to modify interim custody, alleging that their daughter again appeared to have been sexually abused while in Everett's custody. Sharon also revived her previous sexual abuse allegation based on the DNA result, which showed male DNA was present on the child but insufficient for analysis. Sharon accused Everett of failing to respond to the abuse allegations appropriately and of "minimiz[ing] them and repeatedly suggest[ing] that Sharon is the perpetrator." Everett opposed her

---

[4]     The DNA results had not yet come back at the time of the protective order modification hearing.

motion, asserting that Sharon was attempting to interfere with his custodial time by alleging abuse; he emphasized that no Office of Children's Services (OCS) case or criminal charges had been filed and that he had voluntarily submitted a sample of his own DNA when asked to do so by law enforcement.

The court held a hearing in early June on the modification motion. The nurse practitioner who had examined the girl at the Naknek clinic in January testified that she had observed an injury "consistent with penetration" and that Everett, who visited the clinic shortly after the exam, had seemed more concerned about what Sharon had told clinic staff than about the injury. The nurse practitioner also testified that she did not know when the injury had occurred, but noted that "in children, injuries to the genitalia usually heal within 72 hours." Everett testified that he "would take it very seriously" if he believed his child had in fact been abused but that he had "no indication that something may have been wrong with [her]" and had never seen signs of her being sexually abused while in his care. He stated that he "still d[id] not believe that she was sexually assaulted." He suggested that the laceration may have come from the child's own fingernail and that the male DNA may have been transferred from her brother or from someone with whom she had contact while in Sharon's custody.

A few days later the court issued an order modifying interim custody. The court maintained the two-day alternating schedule for their son, but required that their daughter spend nights with Sharon and only be with Everett from 9:00 a.m. to 7:30 p.m. on his custodial days. The court also prohibited Everett from leaving the children in any third party's care, aside from their daycare, during his custodial time.

### 2. Divorce proceedings

A five-day divorce and custody trial was held in early August 2018. In late August the court issued its decree of divorce, child support order, and findings of fact and conclusions of law.

### a. Custody determination

The court awarded Sharon and Everett joint legal and shared physical custody of both children. It modified the custody schedule from alternating every two days to alternating every three or four days. The court found that the timing and cause of their daughter's injury had not been "conclusively establish[ed]" and that Everett had credibly testified at trial that he appreciated the seriousness of sexual abuse allegations and could respond appropriately. The court therefore found that both parents were equally capable of meeting the children's needs.

### b. Child support

Having determined that the parents would share custody, the court next considered child support. The court based its determination of Everett's income for child support purposes on his 2016 tax return, which it found provided "a reasonable representation" of his fluctuating fishing income. Based on his tax return the court found that Everett's adjusted annual income for child support purposes was $61,185.[5] The court reached this figure by applying the formula set forth in Alaska Civil Rule 90.3(a)(1): it subtracted the deductions listed on Everett's federal income taxes, added income from Permanent Fund and Native corporation dividends he received, and applied "allowable deductions."[6] The court found that Sharon's income from "her small business, contract work[,] and a variety of part-time jobs" generally fluctuated between $15,000 and $25,000 and determined that her adjusted annual income for child support purposes was $19,808 based on "her work history, . . . degrees[,] and current employment status." The court ordered Everett to pay $698 per month in child support.

---

[5]    *See* Alaska R. Civ. P. 90.3 (governing child support awards). Rule 90.3(a)(1) defines "adjusted annual income" as "the parent's total income from all sources minus" certain listed deductions.

[6]    *See* Alaska R. Civ. P. 90.3(a)(1).

It later amended this amount to $807 per month based on minor alterations to the custody schedule after reconsideration.

### c.     Property division

The court then turned to dividing the marital estate. It found that although Sharon's college degree and skills made her employable, Everett's earning capacity was greater than hers due to his long-established fishing business. The court also noted that Everett, as an Alaska Native, had healthcare coverage through Indian Health Services, while Sharon did not.

The court found the house where the family had lived to be Everett's separate property, though it awarded Sharon $5,000 for her contributions to its renovation. The court also found that both of Everett's fishing permits and one of his boats — which he had "purchased, paid off[,] and overhauled . . . prior to the marriage" — were his separate property. The court determined that the second boat, the F/V NORTHERN FLYER, was marital property because it had been purchased during the marriage. However, because "Everett's extensive pre-marital experience in the fishery provided him with the opportunity and resources to purchase" the boat, and because he had contributed disproportionately to the "purchase, maintenance[,] and operation of the vessel," the court awarded 70% of the equity in the F/V NORTHERN FLYER to Everett and 30% to Sharon.

For the rest of the marital estate, the court found that balancing the equities warranted awarding 55% to Sharon and 45% to Everett. Based on the property that each party retained, the 55/45 division resulted in Everett owing Sharon an equalization payment of $84,537.60. The court ordered Everett to make the equalization payment within four years of the date of its order, with interest accruing at 5% annually.

### d.     Attorney's fees

Sharon had filed a motion for interim attorney's fees, arguing that her

financial circumstances left her unable to litigate "on an equal footing" with Everett. She later argued that she was entitled to an award of enhanced attorney's fees because of Everett's "vexatious conduct." The court denied the request for enhanced fees, finding that Everett and his counsel's conduct throughout the case did not "[rise] to the level . . . that demands enhanced fees."

The court also found that its 55/45 division of the bulk of the marital estate "place[d] the parties on equal ground to afford the litigation in this case" and declined to issue a fee award separate from the property division.

Sharon appeals, challenging the custody determination, the child support award, the property division, and the lack of an attorney's fees award.

## III.   STANDARD OF REVIEW

We have recognized superior courts' "broad discretion in child custody decisions, and we will reverse only if findings of fact are clearly erroneous or if the superior court abused its discretion."[7] Clear error exists "when a review of the record leaves [us] with a definite and firm conviction that the superior court has made a mistake."[8] "An abuse of discretion exists where the superior court 'considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others,' "[9] or where "the superior court's decision denied a substantial right to or

---

[7]     *Geldermann v. Geldermann*, 428 P.3d 477, 481 (Alaska 2018) (quoting *Riggs v. Coonradt*, 335 P.3d 1103, 1106 (Alaska 2014)).

[8]     *Id.* (alteration in original) (quoting *Riggs*, 335 P.3d at 1106).

[9]     *Id.* (quoting *Riggs*, 335 P.3d at 1106).

substantially prejudiced a party."[10]

"Child support awards are reviewed for abuse of discretion."[11]  However, we review the underlying factual findings, "including findings regarding a party's income," for clear error.[12]  And "[w]hether the superior court applied the correct legal standard to its child support determination is a question of law" reviewed de novo.[13] "Whether there are sufficient findings for informed appellate review is a question of law."[14]

Division of marital property involves three steps:  "(1) deciding what specific property is available for distribution, (2) finding the value of the property, and (3) dividing the property equitably."[15]  "[C]haracterization of property as separate or marital may involve both legal and factual questions."[16]  We review underlying factual findings, including findings as to the parties' "contributions to the marital estate" and

---

[10]     *Id.* (quoting *Ronny M. v. Nanette H.*, 303 P.3d 392, 400 (Alaska 2013)).

[11]     *Ruppe v. Ruppe*, 358 P.3d 1284, 1289 (Alaska 2015) (quoting *Heustess v. Kelley-Heustess*, 259 P.3d 462, 467 (Alaska 2011)).

[12]     *Shanigan v. Shanigan*, 386 P.3d 1238, 1240 (Alaska 2017) (quoting *Wilhour v. Wilhour*, 308 P.3d 884, 887 (Alaska 2013)).

[13]     *Geldermann*, 428 P.3d at 482 (alteration in original) (quoting *Limeres v. Limeres*, 320 P.3d 291, 295 (Alaska 2014)).

[14]     *Horne v. Touhakis*, 356 P.3d 280, 282 (Alaska 2015) (quoting *Hooper v. Hooper*, 188 P.3d 681, 685 (Alaska 2008)).

[15]     *Engstrom v. Engstrom*, 350 P.3d 766, 769 (Alaska 2015) (quoting *Beals v. Beals*, 303 P.3d 453, 458 (Alaska 2013)).

[16]     *Id.* (quoting *Beals*, 303 P.3d at 458-59).

"inten[t] to transmute separate property into marital property," for clear error.[17] Legal conclusions are reviewed de novo.[18] "[V]aluation of assets 'is a factual determination that we review for clear error.' "[19] "We review the trial court's third step, the equitable allocation of property, for an abuse of discretion" and "will reverse only if the division [was] clearly unjust."[20]

Trial courts have "broad discretion" over attorney's fees awards in divorce actions, and we will reverse an award of attorney's fees only if it is "arbitrary, capricious, manifestly unreasonable, or stems from an improper motive."[21]

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Awarding Joint Legal And Shared Physical Custody.

The superior court is entitled to broad discretion in making a child custody determination, provided it considers the appropriate statutory and other factors and does not consider inappropriate ones.[22] Alaska Statute 25.24.150 sets forth a non-exclusive list of factors the court must take into account:

> (1) the physical, emotional, mental, religious, and social

---

[17] *Hall v. Hall*, 426 P.3d 1006, 1009 (Alaska 2018) (alteration in original) (first quoting *Beals*, 303 P.3d at 459; then quoting *Hanson v. Hanson*, 125 P.3d 299, 304 (Alaska 2005)).

[18] *Engstrom*, 350 P.3d at 769.

[19] *Id.* (quoting *Beals*, 303 P.3d at 459).

[20] *Id.* (alteration in original) (first quoting *Beals*, 303 P.3d at 459; then quoting *Ethelbah v. Walker*, 225 P.3d 1082, 1086 (Alaska 2009)).

[21] *Ruppe v. Ruppe*, 358 P.3d 1284, 1289 (Alaska 2015) (quoting *Stevens v. Stevens*, 265 P.3d 279, 284 (Alaska 2011)).

[22] *See Geldermann v. Geldermann*, 428 P.3d 477, 481 (Alaska 2018).

needs of the child;

(2) the capacity and desire of each parent to meet these needs;

(3) the child's preference if the child is of sufficient age and capacity to form a preference;

(4) the love and affection existing between the child and each parent;

(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

(6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, except . . . [where] one parent shows that the other parent has sexually assaulted or engaged in domestic violence against the parent or a child, and that a continuing relationship with the other parent will endanger the health or safety of either the parent or the child;

(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.[23]

The court "need not mention each factor by name"; best interests findings are sufficient so long as they provide "a clear indication of the factors [that the court] considered important in exercising its discretion" or enable this court on review to ascertain what considerations were involved from the record.[24]

---

[23]     AS 25.24.150(c).

[24]     *Mengisteab v. Oates*, 425 P.3d 80, 87 (Alaska 2018) (alteration in original)
(continued...)

Sharon argues the court erred as to the second statutory factor: the parents' respective capacity to meet the children's needs.[25] She contends that the court applied an incorrect standard of proof by requiring " 'conclusive' proof of the abuser's *identity*" rather than evaluating each parent's capacity to ensure the children's safety under a preponderance of the evidence standard.[26] (Emphasis in original.) She asserts that by applying this allegedly heightened standard of proof, the court erroneously concluded that any sexual abuse, if it occurred, may not have occurred during Everett's custodial time or as a result of his failure to protect his daughter. She argues that evidence at trial established that it was "a virtual certainty" that the child was sexually abused while in Everett's custody. She contends that the court also clearly erred when it credited Everett's testimony at trial that he would be able to respond appropriately to sexual abuse allegations in the future. She argues that it was thus clear error to find both parents equally able to provide for the children's physical, emotional, mental, religious, and social needs.

Everett does not directly address Sharon's argument about the standard of proof for the sexual abuse allegations, but he suggests the evidence could not have established the timing and causes of their daughter's injury even under a preponderance standard: he argues that Sharon presented "[n]o evidence . . . that could substantiate when the injury to [the girl] occurred, whether it occurred solely during [Everett's custodial] time, or who was the perpetrator." He asserts that his initial apparent disregard for the possibility of sexual abuse was because he was given only "inconclusive

<hr>

[24]     (...continued)
(quoting *Caroline J. v. Theodore J.*, 354 P.3d 1085, 1092 (Alaska 2015)).

[25]     AS 25.24.150(c)(2).

[26]     *See id.*

information" about her injury, and that he became "convinced that [the girl] had been injured" as soon as he read the CAC report, which he claims he received one day before trial. And he argues that in the absence of testimony from "anyone at CAC or OCS, or any investigators" about the girl's injury, the court was correct to determine that there was no evidence to establish the timing of the injury or prove that it occurred because of Everett's failure to properly supervise his daughter.

In general, each parent in a custody proceeding must establish by a preponderance of the evidence that the parent's proposed custody plan would serve the children's best interests, including that his or her plan can adequately provide for the children's needs.[27] In its findings on this factor, the superior court stated: "The evidence does not conclusively establish when, how[,] or where [the girl] was injured, so the court cannot assume it happened as a result of Everett's failure to protect [her]." This may suggest, as Sharon argues, that the court was looking for "conclusive" proof of the source and timing of the girl's injuries rather than applying a preponderance standard.

But evidence in the record leaves open the possibility that the girl's injuries could have occurred during either parent's custodial time. The nurse practitioner who examined the girl on January 9 stated that injuries to the genital area in children usually heal within 72 hours. Both parents had custody of the children during the 72 hours prior to the examination. And both parents testified at the domestic violence protective order hearings that they had supervised their daughter and that nothing had happened to her

---

[27] *See Snider v. Snider*, 357 P.3d 1180, 1189 & n.34 (Alaska 2015) ("[N]either parent has 'a greater burden than the other in attempting to obtain custody in a dissolution proceeding.' " (quoting *Johnson v. Johnson*, 564 P.2d 71, 75 (Alaska 1977))). An exception applies if the court finds that one parent has committed acts of domestic violence that would give rise to a rebuttable presumption against custody, *see* AS 25.24.150(g), but the court here explicitly found that neither parent had done so.

while she was in their care. Given the competing testimony, and absent any clearer evidence of the timing of the girl's injury, it was not error to conclude that Sharon had not established by a preponderance of the evidence that it occurred during Everett's custodial time.

Furthermore, the court's ultimate finding that both parents could provide equally well for the children's needs rested on its determination that "Everett credibly testified [at trial] that he now understands the seriousness of [sexual abuse] allegations and knows how to respond when his children may be the subject of abuse." Although Everett's trial testimony on this point reflected a change from his testimony in previous hearings, the court appeared to credit Everett's testimony that he had initially received incomplete information about the possible abuse and had only been provided the full medical records shortly before trial.

This finding is not clearly erroneous, especially given the substantial deference we accord factual findings that "are based primarily on oral testimony."[28] Other than the reference to "conclusive" evidence on the specific question of the source of the girl's injury, there is no indication the court applied anything besides a preponderance standard when it evaluated the facts presented. It also weighed the parents' competing trial testimony, and it determined that Everett would be as able to protect his daughter's safety as Sharon.

Trial courts, not appellate courts, bear the primary responsibility for "judging the credibility of witnesses and weighing conflicting evidence."[29] That is exactly what the court did here: it weighed conflicting evidence about Everett's

---

[28] *Berry v. Berry*, 277 P.3d 771, 778 (Alaska 2012) (quoting *Ebertz v. Ebertz*, 113 P.3d 643, 646 (Alaska 2005)).

[29] *Id.* (quoting *Ebertz*, 113 P.3d at 646).

understanding of the sexual abuse allegations, made a credibility determination, and awarded custody based on that determination. We therefore affirm the superior court's award of joint legal and shared physical custody.

**B.** **There Are Insufficient Findings To Support The Calculation Of Incomes And Child Support Award.**

Sharon argues that the superior court clearly erred in its calculation of Everett's income for child support purposes. She challenges the court's use of his 2016 tax return rather than more recent income information; its failure to include over $8,000 she claims he received in payments for boat storage, fishing nets, and artwork sales; and its subtraction of "allowable deductions" from Everett's income without an explanation of what they were. She also argues the court erred by overestimating her income and by using information from different time periods — 2016 for Everett and 2015 to 2017 for Sharon — to calculate income for each parent.

Everett responds that the superior court was within its discretion to select his 2016 tax return as a basis for calculating his income; that his income from artwork sales, boat storage, and fishing nets was properly excluded because it was derived from one-time or infrequent events; and that the court's calculation of Sharon's income was supported by the evidence at trial.

Civil Rule 90.3(a)(1) defines "adjusted annual income" for child support purposes as the parent's "total income from all sources" minus certain deductions, including mandatory deductions like taxes and union dues, voluntary contributions to a retirement account, child or spousal support from other relationships, work-related child care expenses, and health insurance premiums.[30] The commentary explains that "[i]ncome from self-employment . . . includes the gross receipts minus the ordinary and

---

[30] Alaska R. Civ. P. 90.3(a)(1).

necessary expenses required to produce the income."[31] The superior court may exercise "broad discretion in determining what to include in its income calculation."[32] An ongoing child support award "should be based on the income the parent is expected to receive" for the applicable period under the award.[33]

### 1. Although it was not error to rely on Everett's 2016 tax return to calculate his income, the superior court made inadequate findings to support the deductions allowed.

The commentary to Civil Rule 90.3 specifies that child support should be "calculated as a certain percentage of the income which will be earned when the support is to be paid."[34] This determination is "necessarily . . . somewhat speculative" and "may be especially difficult when the obligor has had very erratic income in the past."[35] The superior court has discretion to identify "the best indicator of future earnings,"[36] and it may but is not required to, "average the obligor's past income over several years."[37]

---

[31]    Alaska R. Civ. P. 90.3 cmt. III.B.

[32]    *Holmes v. Holmes*, 414 P.3d 662, 667 (Alaska 2018).

[33]    *Swaney v. Granger*, 297 P.3d 132, 139 (Alaska 2013).

[34]    Alaska R. Civ. P. 90.3 cmt. III.E.

[35]    *Id.*

[36]    *Morris v. Horn*, 219 P.3d 198, 206 (Alaska 2009).

[37]    *Id.; cf Zimin v. Zimin*, 837 P.2d 118, 123 (Alaska 1992) (upholding income determination that rejected obligor's proposed ten-year average and instead based support award on his one-year projected earnings); *and Keturi v. Keturi*, 84 P.3d 408, 413 (Alaska 2004) (upholding income determination based on four-year average).

First, the superior court explained its reliance on Everett's 2016 tax return:

> Everett believably testified that he delivered 150,000 pounds of fish in 2016. According to the 2016 tax return, the gross revenue for those fish was $259,490. Everett testified that the catch in 2017 was slightly lower (140,000 pounds) and in 2018 was significantly higher (230,000 pounds). His gross revenue from fishing in 2015 was $175,110. Income in the fishing industry will be affected by a variety of factors and is not consistent each year. Everett may have other sources of income each year — such as income from his artwork, boat storage and selling fishing gear — but that income will also fluctuate each year. Because of the ongoing potential shift in income, the court finds the income and information from the 2016 tax return is a reasonable representation of Everett's . . . self-employment income.

(Footnotes omitted.) Nothing in Rule 90.3 precludes the court from selecting a benchmark year to determine annual income, and given that Everett's catch size and gross revenue in his 2016 tax return did not appear abnormally high or low compared to other years, it was reasonable for the court to base its expected income determination on the 2016 tax return.

Second, because income calculations for a future period must be based on the parent's expected income,[38] it was not error for the court to exclude infrequent or one-time sources of income, such as the sale of artwork and fishing nets. Everett testified that his income from artwork sales varies from year to year and that he sells fishing gear and rents out boat storage space infrequently. We "give 'particular deference' to the trial court's factual findings when they are based primarily on oral testimony, because the trial court, not this court, performs the function of judging the

---

[38]     *Swaney v. Granger*, 297 P.3d 132, 139 (Alaska 2013).

credibility of witnesses."[39] We therefore find no error in the court's treatment of Everett's artwork and gear sales.

However, the superior court's decision does not contain sufficient findings to support its calculation of deductions allowed from Everett's income. The court determined Everett's total income to be $80,817, and then found that his adjusted annual income "[a]fter allowable deductions" was $61,185. But as Sharon points out, the court's findings and conclusions contain no explanation of how it arrived at a total figure of nearly $20,000 for "allowable deductions."

Rule 90.3(a)(1) lists certain mandatory deductions that must be subtracted from a parent's total income to determine that parent's adjusted annual income; these include, for instance, taxes, union dues, mandatory and voluntary retirement or pension plan contributions, court-ordered child and spousal support from other relationships, work-related childcare expenses, and health insurance premiums.[40] But without findings that indicate which of these items were included in the deductions from Everett's total income, we have no basis on which to assess whether the court's ultimate determination of his income was clearly erroneous.[41] We therefore remand for the court to make the necessary findings with regard to Everett's income.

---

[39] *Berry v. Berry*, 277 P.3d 771, 778 (Alaska 2012) (quoting *Ebertz v. Ebertz*, 113 P.3d 643, 646 (Alaska 2005)).

[40] Alaska R. Civ. P. 90.3(a)(1)(A)-(F).

[41] *See, e.g.*, *Horne v. Touhakis*, 356 P.3d 280, 284 (Alaska 2015) (remanding where "lack of specific findings" precluded appellate review of imputed income determination in child support modification order); *Olmstead v. Ziegler*, 42 P.3d 1102, 1107 (Alaska 2002) ("The trial court is required to enter sufficiently detailed findings of fact to allow for meaningful appellate review.").

### 2. The superior court did not make adequate findings to support its calculation of Sharon's income or the applicable deductions.

When a parent is self-employed, the commentary to Civil Rule 90.3 defines that parent's income as "the gross receipts minus the ordinary and necessary expenses required to produce the income."[42] Here the superior court found that Sharon's income "fluctuated between $15,000 and $25,000 before and during the marriage" and that it derived from multiple "sources including her small business, contract work[,] and a variety of part-time jobs." It determined Sharon's total annual income for child support purposes to be $23,100, and her adjusted annual income after deductions to be $19,808.

But based on the available evidence, this appears to overestimate Sharon's income. The income history on her 2016 Social Security statement shows that her taxable earnings between 2005 and 2015 averaged roughly $10,656 per year. Her 2015 tax return lists a gross income of $30,949 from self-employment and expenses of $17,455, yielding a net income of $13,494. Her 2016 tax return shows that she grossed $2,500 that year, with a net loss after expenses. And she testified that her gross income for 2017 was $21,655. The superior court stated that its income determination for Sharon was based on "her work history, her degrees[,] and current employment status," but the court's findings do not explain how it determined her income or what, if any, expenses it took into account.[43]

---

[42]    Alaska R. Civ. P. 90.3(a)(1)(A)-(E).

[43]    We note that not all expenses that may be deducted for federal tax purposes necessarily qualify as "ordinary and necessary" expenses for purposes of Rule 90.3. *See* Alaska R. Civ. P. 90.3 cmt. III.B ("Ordinary and necessary expenses do not include amounts allowable by the [Internal Revenue Service] for the accelerated component of depreciation expenses, investment tax credits, or any other business expenses determined by the court to be inappropriate.").

If the court determines that a parent is "voluntarily and unreasonably . . . unemployed or underemployed," the rule permits the court to impute income based on the parent's employment history and qualifications as well as available job opportunities.[44] The trial court must make findings sufficient for our review that justify imputing income, such as that the parent is capable of earning more than his or her current income or that higher-paying jobs are actually available.[45]

The superior court's estimation of Sharon's income seems to impute income higher than that supported by the evidence.[46] To the extent that it did, its decision lacks the findings necessary to justify imputation. The decision to impute potential income to a parent who "voluntarily and unreasonably is unemployed or underemployed" must be based on "the parent's work history, qualifications, and job opportunities."[47] We have required findings about the parent's education and qualifications or about available job opportunities to enable meaningful review.[48] Here the court found that Sharon and Everett were both "relatively young . . . and in good health," and that while Sharon's earning capacity was lower than Everett's, "[s]he does have a college degree and skills that make her employable." While these findings indicate that the court considered

---

[44] Alaska R. Civ. P. 90.3(a)(4) & cmt. III.C.

[45] *Frederickson v. Button,* 426 P.3d 1047, 1058-1060 (Alaska 2018) (approving implied finding of unreasonableness based upon evidence presented); *see also Petrilla v. Petrilla*, 305 P.3d 302, 307 (Alaska 2013); *O'Connell v. Christenson*, 75 P.3d 1037, 1040-41 (Alaska 2003).

[46] If the evidence demonstrated a prima facie case of voluntary unreasonable underemployment, then the burden of rebutting that evidence would be Sharon's. *Frederickson*, 426 P.3d at 1059.

[47] Alaska R. Civ. P. 90.3(a)(4).

[48] *See, e.g.*, *Horne v. Touhakis*, 356 P.3d 280, 284 (Alaska 2015).

Sharon's qualifications and job opportunities in calculating a higher income for child support purposes than her work history might indicate, the court made no specific findings on the particular skills or qualifications Sharon's degree and experience gave her, or on the availability of jobs matching those qualifications in Naknek. The court made no findings that Sharon was unreasonably or voluntarily under- or unemployed, finding only that she "stayed home with the children for much of the couple's relationship."

Finally, as with Everett, the court did not explain its calculation of deductions from Sharon's income. Its order stated only that "[a]fter applying allowable deductions, Sharon's annual adjusted income is $19,808." We therefore remand for the court to make the findings necessary to support both its income calculation for Sharon and any deductions it applies.

We note, however, that the court is not required to use earning histories from exactly the same time period for Sharon and Everett, as Sharon argues. Given that each parent's income is variable and derives from different sources, it is within the superior court's discretion to determine what past periods provide the best indicator of each parent's future income.[49] But its income calculations must be supported by sufficiently detailed findings.[50]

C. **It Was An Abuse Of Discretion To Divide The Fishing Vessel Unequally In Everett's Favor, And The Equalization Payment And Attorney's Fees Award Must Be Reconsidered In Light Of This.**

Equitable division of marital assets in a divorce proceeding involves three steps: "(1) deciding what specific property is available for distribution, (2) finding the

---

[49]   *See Morris v. Horn*, 219 P.3d 198, 206 (Alaska 2009).

[50]   *See Olmstead v. Ziegler*, 42 P.3d 1102, 1107 (Alaska 2002).

value of the property, and (3) dividing the property equitably."[51] Generally "only marital property is subject to division upon divorce," and separate property may be invaded "only 'when the balancing of the equities between the parties requires it.' "[52] While "[a]n equal division of marital property is presumptively just,"[53] the court may deviate from an equal division based on the factors enumerated in AS 25.24.160:

> (A) the length of the marriage and station in life of the parties during the marriage;
>
> (B) the age and health of the parties;
>
> (C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;
>
> (D) the financial condition of the parties, including the availability and cost of health insurance;
>
> . . . .
>
> (G) the circumstances and necessities of each party;
>
> (H) the time and manner of acquisition of the property in question; and
>
> (I) the income-producing capacity of the property and the value of the property at the time of division.[54]

---

[51] *Fletcher v. Fletcher*, 433 P.3d 1148, 1152 (Alaska 2018) (quoting *Engstrom v. Engstrom*, 350 P.3d 766, 769 (Alaska 2015)).

[52] *Kessler v. Kessler*, 411 P.3d 616, 618 (Alaska 2018) (quoting AS 25.24.160(a)(4)).

[53] *Pfeil v. Lock*, 311 P.3d 649, 652-53 (Alaska 2013) (quoting *Berry v. Berry*, 978 P.2d 93, 96 (Alaska 1999)).

[54] AS 25.24.160(a)(4). These factors are also referred to as the "*Merrill* factors," since AS 25.24.160(a)(4) codified and expanded the factors we listed in *Merrill*

(continued...)

These factors are not exhaustive; a court "may consider 'any other factors it deems relevant' to dividing the property," provided "the division is 'just' and 'fair.' "[55]

Sharon contends that the superior court made several errors in its property division: it treated one of Everett's fishing boats, the F/V NORTHERN FLYER, differently than the rest of the marital estate despite the fact that the boat was marital property; it inequitably divided the rest of the estate; and it improperly allowed Everett four years to make the equalization payment that it ordered. Everett responds that the decision to award him more of the equity in the F/V NORTHERN FLYER than in the rest of the marital estate was justified by Sharon's minimal involvement in his fishing business. He argues that it was equitable for the court to divide the rest of the marital estate 55/45 in Sharon's favor, with the slightly unequal division enabling her to litigate on an equal footing. And he contends that allowing him four years to make the equalization payment properly took into account his fluctuating income and lack of liquid assets.

### 1.     Based on the court's findings, the F/V NORTHERN FLYER should have been divided on the same or similar terms as the rest of the marital estate.

Unless an exception applies, property acquired by a spouse prior to the marriage is considered separate property; property acquired by a spouse during the marriage is marital property.[56] Ordinarily, " 'all assets acquired by the parties during

---

[54]     (...continued)
*v. Merrill*, 368 P.2d 546, 547-48 n.4 (Alaska 1962). *See Cartee v. Cartee*, 239 P.3d 707, 712 n.9 (Alaska 2010).

[55]     *Pfeil*, 311 P.3d at 653 (quoting *Cartee*, 239 P.3d at 712-13).

[56]     *Kessler*, 411 P.3d at 618.

their marriage are marital property' except for gifts and inheritances."[57]  The parties do not dispute that Everett purchased the F/V NORTHERN FLYER, a commercial fishing vessel, during their marriage.  They and the court valued this vessel at $255,000.  The court divided the equity in the vessel 70/30 in Everett's favor, though it divided the rest of the marital estate 55/45 in Sharon's favor.  Sharon argues that there was no basis to divide the vessel differently than the rest of the marital estate, while Everett argues that the uneven split properly took into account Sharon's lack of involvement in his fishing business, as well as the fact that his fishing experience enabled him to purchase and maintain the vessel.

While marital property may be unequally divided, such a division must be equitable based on the factors in AS 25.24.160(a)(4).[58]  The court abuses its discretion if it "considers improper factors, fails to consider statutorily mandated factors, or gives too much weight to some factors."[59]  Because Alaska favors addressing parties' financial needs through property division rather than alimony, "[w]hen a couple has sufficient assets, the spouse with the smaller earning capacity can and should receive a larger share in the property distribution to aid him or her in [the post-divorce] transition."[60]

Here the superior court found that the F/V NORTHERN FLYER was part of the marital estate, finding that its use "in the commercial fishery, alone, is not a valid exception to a finding of marital property."  The court also found that, although a fishing

---

[57]     *Beals v. Beals*, 303 P.3d 453, 460 (Alaska 2013) (quoting *Johns v. Johns*, 945 P.2d 1222, 1225 (Alaska 1997)).

[58]     *See Pfeil*, 311 P.3d at 653; AS 25.24.160(a)(4).

[59]     *Cartee*, 239 P.3d at 714 (quoting *Long v. Long*, 816 P.2d 145, 150 (Alaska 1991) (addressing abuse of discretion in custody determinations)).

[60]     *Dundas v. Dundas*, 362 P.3d 468, 480 (Alaska 2015) (second alteration in original) (quoting *Day v. Williams*, 285 P.3d 256, 261 (Alaska 2012)).

enterprise, if "treated like a typical business," might "be categorized as separate property and the vessel [as] a business asset," there was "no evidence that Everett had a business license or that his fishing business was an incorporated entity." The court nevertheless awarded 70% of the equity in the F/V NORTHERN FLYER to Everett: "Everett's extensive pre-marital experience in the fishery provided him with the opportunity and resources to purchase the F/V NORTHERN FLYER. An equitable distribution must acknowledge Everett's contributions to the purchase, maintenance and operation of the vessel."

Given that the court found the F/V NORTHERN FLYER to be marital property and determined that an equitable division would award Sharon 55% of the marital estate — findings Everett does not dispute — a different division of the fishing vessel would only be warranted if Everett demonstrated that an exception applied or that the relevant statutory factors justified treating the vessel differently from the rest of the estate.[61] But he does not assert, and the court did not find, that the F/V NORTHERN FLYER was a gift or inheritance and thus an exception to the rule that property acquired during the marriage is marital.[62] Nor is the boat a personal or nontransferable asset such as an educational degree or unmarketable professional goodwill belonging to one spouse that would properly be excluded from the marital estate.[63] It is a tangible asset acquired

---

[61] *See Dragseth v. Dragseth*, 210 P.3d 1206, 1212 (Alaska 2009) ("The party seeking to establish that the property is separate always bears that burden of proof." (quoting *Schmitz v. Schmitz*, 88 P.3d 1116, 1128 (Alaska 2004))).

[62] *See Beals*, 303 P.3d at 460.

[63] *See Richmond v. Richmond*, 779 P.2d 1211, 1213-14 (Alaska 1989) (holding that law practice belonging to one spouse had no marketable professional goodwill and thus should not be divided as part of marital estate), *overruled in part on other grounds by Hansen v. Hansen*, 119 P.3d 1005, 1010 & n.16 (Alaska 2005); *Nelson v. Nelson*, 736 P.2d 1145, 1146 (Alaska 1987) (holding that professional degree obtained
(continued...)

during the marriage, and it is therefore subject to division according to the factors in AS 25.24.160(a).

And Everett did not demonstrate that the statutory factors favored him. Most of the court's findings on the statutory factors either weigh equally for both parties or favor Sharon. The court first found that both spouses were "relatively young . . . and in good health" at the time of divorce and that "they had already established their respective professions" when they married — findings that would seem to support an equal property division.[64] But the court also found that Sharon's earning capacity was significantly lower than Everett's and likely would be for some time; that she had stayed home to care for the children for much of the marriage, including during Everett's fishing trips; and that Everett had healthcare coverage through Indian Health Services while Sharon would have to pay for private insurance.[65] Additionally, the court found that even though Sharon had never served as a crew member, "her assistance around the fishing season contributed to the fishing business"; Everett had on at least one occasion paid her a $5,000 crew share. And as Sharon points out, the fishing vessel will continue to generate income for Everett in the future.[66] These factors would seem to support

---

[63]     (...continued)
by one spouse is not marital property subject to division upon divorce).

[64]     *See* AS 25.24.160(a)(4)(A)-(B) (listing as factors "the length of the marriage," the spouses' "station in life" during marriage, and "the age and health of the parties").

[65]     *See* AS 25.24.160(a)(4)(C), (D), (G) (listing as factors parties' respective earning capacities in light of their education, qualifications, and childcare responsibilities during marriage; parties' financial condition "including the availability and cost of health insurance"; and "the circumstances and necessities of each party").

[66]     *See* AS 25.24.160(a)(4)(I) (listing as factor "the income-producing capacity
(continued...)

deviating in Sharon's favor from an equal division — which the court did with the rest of the marital estate.

The only factor in Everett's favor was the fact that his fishing expertise and income were what allowed him to purchase and generate income from the vessel.[67] But even if one spouse's qualifications allow a couple to acquire an asset, that fact does not by itself alter the marital character of that asset. In the case of corporate good will, for instance, we have held that "earning capacity attributable solely to the expertise, talents and personality of one spouse" may properly be part of the marital estate,[68] provided that the goodwill is marketable and could be sold to a prospective buyer.[69] We have also noted that an unequal property division can be used to compensate one spouse for providing support that allows another to increase his or her earning capacity, such as by earning a professional degree.[70] Sharon contributed to Everett's earning capacity by caring for the children and providing shore support while he fished; her support may have helped make possible the purchase of the fishing vessel in the first place. And

---

[66]    (...continued)
of the property").

[67]    *See* AS 25.24.160(a)(4)(H) (listing as factor "the time and manner of acquisition of the property in question").

[68]    *Richmond*, 779 P.2d at 1213, *overruled in part on other grounds by Hansen*, 119 P.3d at 1010 & n.16.

[69]    *Hansen*, 119 P.3d at 1010 ("If the goodwill is not marketable, then no value for goodwill should be considered in dividing the marital assets."); *accord Moffitt v. Moffitt*, 749 P.2d 343, 347 (Alaska 1988).

[70]    *Nelson v. Nelson*, 736 P.2d 1145, 1146-47 (Alaska 1987) (holding that while "professional degree is not property subject to division," spouse's contributions to increase in earning potential of spouse who earned degree "may justify a favorable award of property to the supporting spouse").

Everett did not present evidence that would justify either treating the F/V NORTHERN FLYER as separate property or deviating so greatly from the division applied to the rest of the marital estate. In fact, the court specifically discounted the credibility of some of Everett's testimony about his fishing business and the extent of Sharon's assistance with it.

We also note that although the court decided on a 55/45 split of the rest of the marital estate in Sharon's favor, its 70/30 division of the F/V NORTHERN FLYER resulted in Sharon being awarded roughly $87,137 of the total estate and Everett receiving roughly $139,695 — an approximately 62/38 split in *Everett's* favor. Given the court's findings on the parties' respective earning capacities and the paucity of evidence that would justify treating the fishing vessel differently from the rest of the marital property, this division was clearly unjust.

We therefore vacate the court's award of 70% of the equity in the F/V NORTHERN FLYER to Everett and remand the property division to the superior court so that the marital estate, including the F/V NORTHERN FLYER, may be equitably divided pursuant to AS 25.24.160(a)(4).

### 2. The equalization payment must be recalculated in light of our decision on the property division.

The court's decision to divide the F/V NORTHERN FLYER's equity 70/30 in Everett's favor and the remainder of the marital estate 55/45 in Sharon's favor resulted in Everett owing Sharon an equalization payment of $84,537.60. But because we vacate the property division on the ground that the fishing vessel should not have been treated differently than the other marital assets, the value of the equalization payment will necessarily change on remand. We therefore remand so that the equalization amount can

be calculated in light of an equitable division that comports with this opinion.[71]

Assuming that the equalization amount determined on remand continues to be a sum too large for Everett to make in a single payment, the superior court has discretion to order a multi-year payment schedule. In establishing such a schedule, the court must pay careful attention to each party's financial circumstances, including any potential hardship Sharon may suffer from the delay in receiving the equalization payment.[72] The superior court gave Everett four years to make the equalization payment, with interest accruing at 5% per year. But without a prescribed schedule of regular payments, the court left it to Everett's good will, and desire to avoid interest payments, to ensure that Sharon received the equalization payment in less than four years. Particularly since the court declined to award Sharon attorney's fees because it preferred to place the parties on equal litigation footing by means of the property division, the failure to establish a payment schedule was error.[73]

---

[71] Because we reverse the property division based on the superior court's treatment of the F/V NORTHERN FLYER, and because a new property division on remand will affect the total amounts Sharon and Everett will receive, we do not reach Sharon's argument that the 55/45 division of the rest of the estate was inequitable.

[72] *Fortson v. Fortson*, 131 P.3d 451, 459 (Alaska 2006) (holding that an eighteen month pay period was appropriate); *see also Hunt v. Hunt*, 698 P.2d 1168, 1191 (Alaska 1985) (holding that the superior court did not abuse its discretion for a three-year payout period).

[73] *See, e.g.*, *Rosenberg v. Rosenberg*, No. S-16968, 2019 WL 3715062, *3-4 (Alaska Aug. 7, 2019) (upholding payment schedule and accrual of interest for equalization payment).

### 3. Attorney's fees must be revisited in light of our decision on the property division.

Attorney's fee awards in divorce cases lie "within the broad discretion of the trial court and will not be disturbed on appeal unless [they are] 'arbitrary, capricious, or manifestly unreasonable.' "[74] While "[a] prevailing party in a civil case is normally entitled to an award of attorney's fees,"[75] in divorce cases, awards of attorney's fees are generally based not on prevailing party status but on the spouses' relative earning capacities and economic positions.[76] Because "[t]he purpose of awarding attorney's fees in divorce proceedings is to level the playing field," the court must consider "not only earning capacities and separate resources, but also the distribution of marital assets itself."[77] A court may also order a party who has acted in bad faith or vexatiously to pay enhanced attorney's fees.[78] If awarding enhanced fees, the court must first determine appropriate fees based on each parties' economic status and then increase the award based on a party's misconduct.[79]

---

[74] *Berry v. Berry*, 277 P.3d 771, 779 (Alaska 2012) (quoting *Ferguson v. Ferguson*, 195 P.3d 127, 130 (Alaska 2008)).

[75] *Johnson v. Johnson*, 239 P.3d 393, 399 (Alaska 2010); *see* Alaska R. Civ. P. 82(a).

[76] *See Berry*, 277 P.3d at 779 (quoting *Johnson*, 239 P.3d at 399).

[77] *Id.* (alteration in original) (quoting *Dragseth v. Dragseth*, 210 P.3d 1206, 1212 (Alaska 2009)).

[78] *Id.* at 799-80 (quoting *Edelman v. Edelman*, 61 P.3d 1, 5-6 (Alaska 2002)).

[79] *Id.* (quoting *Edelman*, 61 P.3d at 5-6).

The court found that "Everett has had a significantly higher earning capacity" than Sharon, but declined to issue an award of attorney's fees, finding that the 55/45 division of the marital estate (excluding the F/V NORTHERN FLYER) put Sharon and Everett "on equal ground to afford . . . litigation." The superior court also rejected Sharon's request for an enhanced fee award, finding that Everett's conduct did not rise to the level of bad-faith or vexatious conduct that would warrant enhanced fees.

Because the court addressed attorney's fees through the property division, and because we vacate and remand the property division, the court must also reconsider attorney's fees on remand. A property division that comports with this opinion may also adequately address the issue of fees.

However, we point out that the structure of the attorney's fees decision issued by the superior court left Sharon, in practice, unable to litigate on an equal footing. The court gave Everett four years to make the equalization payment, ordering that interest would accrue at 5% per year but not requiring specific installments or partial payments to be made earlier. In the meantime, although the court had already found that Sharon "could not litigate the divorce on fairly equal footing without contributions from Everett," Sharon retained only $2,599 in marital assets based on the court's division of property, while Everett retained $219,233. As a practical matter, therefore, the court's use of the property division to address attorney's fees left Sharon without funds to afford litigation on an equal footing unless Everett decided to make at least part of the equalization payment immediately.

Equitable division of marital assets is one factor to consider in an attorney's fees award. But where significant economic disparity exists between the spouses, and where the property division may not be effectuated for a significant period of time, relying solely on the property division to address attorney's fees unfairly burdens the spouse with lower earning capacity and fewer assets and thwarts the purposes of the

exceptions set forth in AS 25.24.160. In these circumstances, the court's failure to consider the practical effect of neither awarding separate attorney's fees nor requiring a payment schedule for the equalization payment was an abuse of discretion.

## V.    CONCLUSION

Because the superior court's findings with regard to the parents' capacity to provide for their children's needs were not clearly erroneous, we AFFIRM the custody determination. We VACATE and REMAND the child support award for further findings to explain the calculations of the parents' income. We also VACATE and REMAND the property division, and the decision on attorney's fees that relies on it, to be recalculated in light of this opinion.