*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| TROY A. ROHDE, | ) |
| | ) Supreme Court No. S-17876 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-19-07529 CI |
| v. | ) |
| | ) O P I N I O N |
| ANNETTE L. ROHDE, | ) |
| | ) No. 7590 – April 15, 2022 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Herman G. Walker, Jr., Judge.

Appearances: Troy A. Rohde, pro se, Anchorage, Appellant. Robin A. Taylor, Law Office of Robin Taylor, Anchorage, for Appellee.

Before: Winfree, Chief Justice, Maassen and Borghesan, Justices. [Carney, Justice, not participating.]

MAASSEN, Justice.

## I.    INTRODUCTION

In a property division following divorce, the superior court determined that the marital estate should be divided 60/40 in the husband's favor because of his lower earning potential. But the court then considered the husband's sale of the marital home; it found there were remodeling expenses and financial dealings that were inadequately explained and contributed to a loss of marital equity, and it decided to offset that loss by dividing the wife's retirement savings plan 70/30 in her favor. And because the

retirement savings plan was the most significant marital asset, this allocation of it resulted in a property division that highly favored the wife. The husband appeals, alleging errors in the property division, in the child support order, and at trial.

We conclude that the property division failed to follow the proper procedure for addressing the post-separation dissipation of marital assets: first valuing the dissipated asset at the time of separation and then crediting that amount to the responsible spouse in the property division. We also conclude that a figure for the amount of lost marital equity used in the property division was clearly erroneous. We therefore vacate the property division and remand for further consideration. In all other respects we affirm the superior court's judgment.

## II.    FACTS AND PROCEEDINGS

Troy and Annette Rohde married in 1994 and have three daughters, one of whom was still a minor at the time of trial. Annette worked as a physical therapist and Troy worked part-time in the construction industry. They separated in June 2018.

### A.    Division of Property

In December 2018 Troy asked Annette to quitclaim her interest in the marital home to him so that he could sell the house to an investor for $146,000. Annette complied, but the deal fell through when the investor learned that the septic system needed to be replaced at an estimated cost of $35,000.

In January 2019 Troy talked to his friend and sometime employer Yaroslav "Slavik" Lund about remodeling the home to prepare it for sale. According to Troy, Lund's business was "flip[ping] houses"; that is, he would buy a dilapidated property and then "basically strip[] the house down to its skeleton and rebuild[] it." Troy gave Lund a power of attorney to manage the remodel and arrange for the home's sale. But the two men had no written contract or explicit agreement about specific renovations other than, as Troy described it, to "put as much money as we need to into it to get as

much money as we can out of it." At trial Troy confirmed that he left decisions on the house up to Lund's discretion. The remodel was financed by a man named Thomas Tyler; Troy gave no details of that arrangement.

Troy and Lund first agreed to a sale that would have netted only about $10,000 to the marital estate. The settlement statement for that proposed deal shows a sale price of $364,500, a first mortgage balance of $88,040, a contractor's lien in Lund's name of $45,000, and a second mortgage in Tyler's name of $186,339. When Annette learned of this arrangement she demanded documentation justifying such a small recovery of equity.

Lund provided a list of expenses totaling $137,984, a spreadsheet showing that $175,000 was borrowed to finance the project, and a proposal that Lund would be paid $45,000 to manage the project. Another spreadsheet listing expenses on the project showed that Lund was paid $2,000 a month for five months as an "[a]dministration [s]alary" and was entitled to "25% for [p]rofit and [o]verhead" — a total of $40,873 in addition to the $10,000 in salary payments. Lund sent Annette a number of receipts showing payments to subcontractors and suppliers, but she protested that they did not add up to the amounts of the liens against the property and that some appeared to be for non-project-related expenses.

The house eventually sold for $364,500, but Lund's payout was reduced to $36,500 and Tyler's to $175,000. The marital estate ultimately received $35,000.

When the superior court divided the marital estate, it considered the so-called "*Merrill* factors" codified in AS 25.24.160(a)(4)[1] and concluded that, because Annette's future earning potential was higher than Troy's, the marital estate should be

---

[1]     The statute lists factors a superior court should consider to ensure that "the division of property . . . fairly allocate[s] the economic effect of divorce." The factors were drawn from *Merrill v. Merrill*, 368 P.2d 546, 547 n.4 (Alaska 1962).

divided 60/40 in Troy's favor. But the superior court was not satisfied with Troy's explanation of why the marital estate received only $35,000 from the sale of the home. Therefore, "to account for [Troy]'s handling of the house sale," the court distributed Annette's 401(k) — the marriage's only other sizable asset — 70/30 in favor of Annette.

Troy moved for reconsideration. The superior court denied his request, finding explicitly that Troy had "dissipated the marital home and deprived the marital estate of that asset" and that it was equitable to offset the dissipation by a 70/30 allocation of the 401(k).

## B.    Income Imputation

The superior court granted sole legal and physical custody of the couple's minor child to Annette. For purposes of calculating child support, the superior court imputed income to Troy, whose annual earnings as a self-employed construction worker had recently hovered between $30,000 and $50,000. The court found that he had been underemployed during the marriage and remained voluntarily underemployed following the parties' separation. The court imputed income to Troy at a "yearly gross salary of $66,248" based on an hourly wage of $31.85 — the average wage for a carpenter as shown by data from the Alaska Department of Labor.

Troy appeals the superior court's decisions on property distribution and child support. He also contends that several of the court's procedural and evidentiary rulings at trial deprived him of due process.

## III.    STANDARD OF REVIEW

We review the superior court's distribution of marital assets for abuse of discretion.[2] The court abuses its discretion if it "considers improper factors, fails to

---

[2]    *Ethelbah v. Walker*, 225 P.3d 1082, 1086 (Alaska 2000) ("We review the trial court's equitable distribution under an abuse of discretion standard, and will reverse (continued...)

consider statutorily mandated factors, or gives too much weight to some factors."[3] We review the superior court's findings of fact for clear error.[4] "A finding is clearly erroneous if we are 'left with a definite and firm conviction that the trial court has made a mistake.' "[5] We review the superior court's decision to impute income for abuse of discretion[6] and the amount of income imputed for clear error.[7]

As for the "separate question . . . whether the trial court applied the correct legal standard in the exercise of its broad discretion . . . [w]ith respect to legal analysis employed at the trial court level, review is based upon our independent judgment."[8]

We review alleged due process violations using our independent judgment and adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[9]

---

[2] (...continued) only if the division is clearly unjust.").

[3] *Thompson v. Thompson*, 454 P.3d 981, 995 (Alaska 2019) (quoting *Long v. Long*, 816 P.2d 145, 150 (Alaska 1991)).

[4] *Aubert v. Wilson*, 483 P.3d 179, 186 (Alaska 2021).

[5] *Fredrickson v. Button*, 426 P.3d 1047, 1052 (Alaska 2018) (quoting *Heustess v. Kelley-Heustess*, 259 P.3d 462, 468 (Alaska 2011)).

[6] *Id.*

[7] *Id.*

[8] *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983).

[9] *Martinez v. Gov't Emps. Ins. Co.*, 473 P.3d 316, 321 (Alaska 2020).

## IV.    DISCUSSION

### A.    The Property Distribution Must Be Reconsidered On Remand.

#### 1.    There was error in the superior court's dissipation analysis.

Troy challenges the superior court's distribution of marital property on the grounds that the superior court erred in using "different distribution rates" for different parts of the marital estate and in its valuation of the equity in the marital home. Applying the *Merrill* factors,[10] the superior court divided all marital assets except the 401(k) in Troy's favor, 60/40. The 401(k) — the marriage's largest asset at $301,244 — the court divided 70/30 in favor of Annette. The court justified this different division by reference to Troy's "handling of the house sale," which it described as "suspect." But because the value of the 401(k) dwarfs the value of the estate's other assets, the result of the division was an asset split that is essentially 70/30 in favor of Annette, a result much different from the one the court reached by analyzing the *Merrill* factors.[11]

The superior court initially declined to make a "specific finding of dissipation" because "[n]either party argued" the issue. Troy asked the court to "clarify" this aspect of the property division, pointing out the difference between the *Merrill* factor analysis and the case's actual result. He also contended that the court "ha[d] not made any findings or reached any conclusions that support such a distribution of the marital assets."

---

[10]    *See* AS 25.24.160(a)(4).

[11]    The 60/40 distribution of all marital assets other than the 401(k) resulted in a net credit to Annette of $1,492 and a net credit to Troy of $2,237. The court's 70/30 division of the 401(k) — $210,871 to Annette and $90,373 to Troy — resulted in net credits of $212,363 to Annette and $92,610 to Troy, a split of 69.6% (Annette) to 30.3% (Troy).

The court's follow-up order clarified its reasoning. This time the court made an explicit "finding that [Troy] dissipated a marital asset, the marital home." The court subtracted the $88,000 mortgage from the home's $364,000 sale price to conclude that there was "approximately $276,000 in equity that should have been part of the marital estate." And because the marital estate received only $35,000 from the sale, the court concluded that the equity must have been dissipated due to Troy's mismanagement and poorly explained dealings with Lund and Tyler. We conclude that it was error to follow this analytical process instead of our precedent on the recapture of dissipated value; we also conclude that it was clear error to use the house's final sale price — following an extensive remodel — as its value at separation.

### a. The proper remedy for dissipation is recapture.

"[T]he question of wasted marital assets arises when a marital asset is lost or diminished after separation but before the time of trial."[12] "The party [who] controls a marital asset during separation may have to compensate the other party if he or she dissipates or wastes the asset and converts it to non-marital form."[13] "The spouse who asserts dissipation must first prove two things: (1) that the asset existed and (2) that the asset 'was lost during or after the marital breakdown.' "[14] "[T]he burden [then] shifts to the [other] spouse to show that he or she did not dissipate the asset."[15]

---

[12] *Aubert v. Wilson*, 483 P.3d 179, 189 (Alaska 2021) (alteration in original) (quoting *Jones v. Jones*, 942 P.2d 1133, 1139 (Alaska 1997)) .

[13] *Id.*

[14] *Id.* (quoting *Ethelbah v. Walker*, 225 P.3d 1082, 1090 (Alaska 2009)).

[15] *Id.* (third alteration in original) (quoting *Ethelbah*, 225 P.3d at 1090).

If dissipation is found, the remedy is "recapture."[16] To recapture an asset the court values it at the time of separation — not the time of trial — and credits that value to the spouse who dissipated the asset.[17]

We have treated this issue inconsistently in the past. Notably, the statute codifying the *Merrill* factors, AS 25.24.160(a)(4), mandates distribution of marital assets "without regard to which of the parties is in fault." In *Oberhansly v. Oberhansly* we observed that the "fault" referenced in the statute is fault for the failure of the marriage, not fault for the dissipation of marital assets; we held that the latter type of fault could fairly be considered.[18] We therefore upheld the unequal property division in *Oberhansly* in part because "the superior court properly considered [one party's] fault in allowing most of the household debts to fall in default and in paying personal debts out of marital assets."[19]

But in *Jones v. Jones* we clarified how courts should treat one party's alleged financial misconduct consistent with AS 25.24.160(a)(4).[20] *Jones* concerned the depletion of assets by illegal gambling during the marriage.[21] We held that "a court may take into account economic misconduct . . . , but it may not consider a party's moral or

---

[16] *Id.*

[17] *Day v. Williams*, 285 P.3d 256, 264 n.27 (Alaska 2012).

[18] 798 P.2d 883, 885 (Alaska 1990).

[19] *Id.*

[20] 942 P.2d 1133, 1137-41 (Alaska 1997).

[21] *Id.* at 1138.

legal marital failings which do not amount to economic misconduct."[22]   And we concluded that the remedy for economic misconduct was not an ad hoc increase in the other party's share of the marital estate, but rather a recapture of "the proven losses by adding their value to the marital estate before making the equitable division and then crediting that part of the value to the account of the party responsible for the unreasonable depletion."[23]  We also cautioned the superior court not to "double count" by both recapturing dissipated assets and separately favoring the non-dissipating spouse in the property division.[24]

In sum, courts may properly consider dissipation in the *Merrill* factor analysis when weighing "the conduct of the parties, including whether there has been unreasonable depletion of marital assets."[25]   But if the superior court does find "unreasonable depletion" — i.e., dissipation — the proper remedy is to recapture the lost asset by valuing it at separation and crediting that value to the responsible party.  The property division in this case was inconsistent with that procedure.

### b.     The amount of lost equity the superior court attributed to dissipation is clearly erroneous.

We also conclude that it was clear error to value the dissipated equity at $276,000.  The superior court described in its clarifying order how it reached this amount:  "At the time of separation there was $88,000 owed on the mortgage.  The home sold for $364,000.  That means there was approximately $276,000 in equity that should have been part of the marital estate."  As explained above, however, it is the time of

---

[22]    *Id.* at 1139.

[23]    *Id.* at 1141.

[24]    *Id.*

[25]    AS 25.24.160(a)(4)(E).

separation, not the time of sale, that is relevant to the dissipation analysis. Because the parties did not expressly argue dissipation at trial, there was no evidence admitted expressly for the purpose of determining the home's value at separation. What the record does show, however, is that the value of the house at separation was well below its final sale price.

Annette testified that the house was a "fixer-upper that did not get fixed up" and was "probably not" in rentable condition when the parties separated. She acknowledged that the septic system needed replacing, there was a hole in the roof, and the home's overall condition was worse at separation than when they bought it. And although Troy failed to fully account for the amount of money spent on the post-separation remodel, the fact that there *was* an extensive remodel is undisputed. Annette does not contend that nothing was spent on fixing up the house, but rather that too much was spent without being properly accounted for.

Troy suggests that the home's value at separation could be determined by reference to the 2018 tax-assessed value of $211,500, assuming the house was "in good condition," then subtracting the $35,000 cost of the septic system replacement and the June 2018 mortgage balance of $90,849. These calculations yield an equity value of $85,651, less than a third of the $276,000 found by the court. Also relevant may be the $146,000 offer Troy testified he received on the house before the remodel began.

We leave it to the superior court to determine whether the existing record is sufficient to determine the home's value at separation or whether it should invite the parties to submit evidence focused on that issue. But because the record does not support

an equity value at separation of $276,000, we vacate the court's property division and remand for reconsideration of the dissipation issue consistent with this opinion.[26]

## 2. The superior court did not clearly err or abuse its discretion in its distribution of the life insurance policies.

Troy also argues that the superior court erred in its distribution of three life insurance policies, one for each of the Rohdes' daughters. Both Troy and Annette testified it had always been their intent for the policies to benefit the children. The court found that the life insurance policies belonged to the daughters and ordered that the two "adult children shall have control of their own policies" to do with as they wished and Annette should control the minor daughter's policy and "make the payments."

Troy contends that the court's ruling was improperly based on ex parte allegations that Troy wanted to cash in one of the policies and buy a car. But the court's decision to award the policies as it did is supported by the testimony of both parties, who testified that the policies were intended as gifts to the daughters. Property belonging to a couple's children is not marital property.[27] And giving control of the minor child's insurance policy to Annette, the parent with sole legal and physical custody, was clearly appropriate. The court did not clearly err in finding that the policies were not marital property or abuse its discretion in awarding control of the minor child's policy to Annette.

---

[26] Troy also argues that the superior court erred by failing to consider the quitclaim deed by which Annette signed over to him her interest in the marital home. But legal title is not a determinative factor in an equitable distribution. *See Wanberg v. Wanberg*, 664 P.2d 568, 572 (Alaska 1983) (holding that "[a]lthough [appellant's] name never appeared on the title . . . it was an abuse of discretion . . . to shield the property from equitable distribution"); *cf. Stanhope v. Stanhope*, 306 P.3d 1282, 1287 (Alaska 2013) ("[H]olding joint title is not determinative of intent to treat property as marital . . . ." (quoting *Johns v. Johns*, 945 P.2d 1222, 1225 (Alaska 1997))).

[27] *Beal v. Beal*, 88 P.3d 104, 119 (Alaska 2004).

### 3. The remaining claims of error in the property distribution may be decided on remand.

Troy alleges several other errors in the superior court's property distribution. He asserts that he made a $5,000 payment at closing to facilitate the sale of the marital home and this amount should be credited to him in the property distribution table. Relatedly, he argues that the insurance and escrow refunds following the sale should be considered his separate property because they accrued from his post-separation mortgage payments.

Troy is correct that the court must "consider payments made to maintain marital property from post-separation income when dividing marital property."[28] But the court retains the discretion to decide whether such payments should be credited to a party in the property division (as a so-called "*Ramsey* credit").[29] Thus, although the court should consider Troy's post-separation payments on remand, it is not bound to adjust the property distribution because of them.[30]

### B. The Superior Court Did Not Err By Imputing Income To Troy.

Troy argues that the superior court erred when it imputed income to him for purposes of determining his child support obligation. The court fixed his annual income at $66,248, an amount Troy characterizes as far above his historical average of $35,258.

---

[28] *Hall v. Hall*, 446 P.3d 781, 783 (Alaska 2019) (quoting *Ramsey v. Ramsey*, 834 P.2d 807, 809 (Alaska 1992)).

[29] *Id.*

[30] Troy also argues that a television in Annette's possession was erroneously credited to him instead. We agree with Annette that this complaint is *de minimis* given the asset's $100 value; however, our remand focused on the value of the home at separation does not preclude the court from reconsidering this and other, more minor aspects of the property division.

Under Alaska Civil Rule 90.3(a)(4), the superior court may base child support payment amounts on the "potential income of a parent who voluntarily and unreasonably is unemployed or underemployed." The court should impute income if "a parent's current situation and earnings reflect a voluntary and unreasonable decision to earn less than the parent is capable of earning."[31] Imputing income is appropriate when the parent's earnings are depressed due to "purely personal choices" rather than uncontrollable "economic factors."[32]

We recently described two scenarios for the imputation of income.[33] The first "scenario is when [one spouse] points to [the other spouse's] previous employment and related income as a prima facie case for underemployment," and the court relies on that earnings history to impute income.[34] The second scenario requires the court to evaluate a spouse's earning potential in the absence of a relevant earnings history.[35] In this second scenario we require "specific findings on the particular skills or qualifications" and "the availability of jobs matching those qualifications."[36]

Troy disputes that he was voluntarily underemployed, contending that he worked fewer hours during the marriage and the two years following separation because

---

[31]    *Fredrickson v. Button*, 426 P.3d 1047, 1059 (Alaska 2018).

[32]    *Id.*

[33]    *Vogus v. Vogus*, 460 P.3d 1220, 1222 (Alaska 2020).

[34]    *Id.*

[35]    *Id.*

[36]    *Thompson v. Thompson*, 454 P.3d 981, 993 (Alaska 2019) (vacating an order imputing income above historical earnings where "the court made no specific findings on the particular skills or qualifications [a party's] degree and experience gave her, or on the availability of jobs matching those qualifications").

of family responsibilities, including the needs of his ailing parents. But the court did not credit his arguments with respect to his childcare duties, and while recognizing that he had commitments to his parents, it did not find them so onerous as to preclude him from full-time work. These findings are not clearly erroneous.

As for Troy's skills and qualifications, he argues that much of the carpentry work in Alaska requires either a license or union membership, and he has neither. But he had a carpentry contractor's license in the past; he does not suggest that he could not get one again. The court found that Troy's "whole career ha[d] been in the construction business." The court found that he knew "all facets of the business," had "the skills and opportunity to work for several different operators in the construction industry," and was qualified to be "a project manager that should be earning more than $25 per hour." These findings were supported by the testimony of Annette, Troy himself, and a real estate agent who regularly used Troy's services to fix up properties for sale. Troy described his past work as a carpenter and confirmed that he was qualified to work as a construction project manager (and in fact was managing a project at the time of trial). The court was presented with the average wage for a project manager ($55.57 an hour) and the average wage for a carpenter ($31.85 an hour) and chose the lower of the two, finding that Troy's skills "could earn him at least carpenter's wages."

We have vacated income imputation orders that lacked well-supported findings of work experience and job availability.[37] In *Thompson v. Thompson*, for example, we addressed the income imputed to a former stay-at-home parent with a college degree.[38] The superior court imputed income to her but did not make findings about her work experience, job qualifications, or the availability of jobs where she

---

[37]    *See id*.

[38]    *Id.* at 993-94.

-14-                                           7590

lived.[39]  In this case, on the other hand, the court made extensive findings about Troy's experience and qualifications.  And although the court did not specifically identify available jobs, there is support in the testimony for its finding that he had the "opportunity to work for several different operators in the construction industry," and Troy does not directly attack this finding.

We conclude that the superior court did not abuse its discretion by imputing income to Troy.  And given the extensive evidence that Troy should be able to earn "at least" as much as an average carpenter, the superior court did not clearly err by imputing income at that level.

**C.  The Superior Court Did Not Err In Its Ruling On Child Support Arrears.**

The court ordered that Troy's child support obligation begin on July 1, 2018, the month after the parties separated.  Troy challenges this aspect of the court's order on several grounds.  First, he argues that he should not be required to pay child support for the first two months of separation because Annette was still living in the marital home and he was making the mortgage payments.  But "[w]e have repeatedly recognized that child support should be calculated from the date of separation";[40] the superior court properly applied this rule.  Troy argues that this means he "essentially paid twice, through the mortgage payment on the marital house and again with the child support ordered."  But whether Troy is entitled to a "*Ramsey* credit" for post-separation mortgage payments is something for the court to consider in its property division, as discussed above; it has nothing to do with Troy's independent obligation to support his

---

[39]  *Id.*

[40]  *Christopher D. v. Krislyn D.*, 426 P.3d 1118, 1123 (Alaska 2018).

-15-                                                    **7590**

children in an amount determined under Civil Rule 90.3. Child support is based on the obligor parent's income, not on where the custodial parent is living with the children.

Troy makes a related argument about payments he made to Annette shortly before trial, which he argues were intended as child support. The court chose to treat the majority of those payments as reimbursement for Annette's post-separation payment of some of Troy's expenses, including the costs of medical and car insurance, leaving the remainder to go toward child support. Troy contends this was error because he intended the payments to be for child support in their entirety and the court's redirection of them meant he had more child support arrears and thus owed more interest.

"Trial courts have broad discretion in fashioning property divisions."[41] When the property division involves the allocation of post-separation payments, we review the allocation for an abuse of discretion, reversing only if "the reasons for the exercise of discretion are clearly untenable or unreasonable."[42] Here, given the other outstanding obligations between the parties, the superior court was not obliged to accept Troy's characterization of his post-separation payments. Because the court's exercise of discretion was not "clearly untenable or unreasonable," we affirm it.

Finally, Troy argues that the superior court erred by applying its determination of his imputed income "to the arrearages" rather than just his future support obligations.[43] But the court found that Troy "had the opportunity to work full-

---

[41] *Edelman v. Edelman*, 3 P.3d 348, 351 (Alaska 2000).

[42] *Hall v. Hall*, 446 P.3d 781, 783 (Alaska 2019) (quoting *Jensen D. v. State, Dep't of Health & Soc. Servs.*, 424 P.3d 385, 387 (Alaska 2018)).

[43] We note that there is no issue here of retroactive modification of arrearages, prohibited by Civil Rule 90.3(h)(2). "The rule against retroactive modification . . . only prohibits modifying 'arrearage' already due under a 'final child support award' in

(continued...)

time during the marriage and after the date of separation." "The obligation of parents to support their children 'begins . . . on the date the parents stop living together.' "[44] Based on its factual finding that Troy was underemployed from the onset of his child support obligation, the court did not abuse its discretion when it applied the imputed income to all past amounts.

### D.    Troy's Due Process Arguments Are Without Merit.

Troy also argues that he was denied due process. He claims that the superior court gave more time to Annette's witnesses, applied hearsay and other evidentiary rules inconsistently, considered Annette's health restrictions but not his, denied him the opportunity to call his father as a witness, and substantively relied on an exhibit that had been admitted for demonstrative purposes only. But even if we were to find due process violations, they would be harmless error absent "a plausible claim of prejudice."[45]

Troy does not explain how any time imbalance at trial caused him harm. He testified, called his own witnesses, and cross-examined Annette's witnesses, and he never suggested he needed more time to present his case. The court denied his request to call his father because it had already found his sister credible on the issue he wanted

[43]    (...continued)
existence when a motion to modify is filed." *Duffus v. Duffus*, 72 P.3d 313, 320 (Alaska 2003). "When there is no child support order covering the relevant time period, applying the methodology of Rule 90.3 'does not modify an existing arrearage.' " *Christopher D.*, 426 P.3d at 1123 (quoting *Crayton v. Crayton*, 944 P.2d 487, 490 (Alaska 1997)). The order here on review was the case's first final child support award.

[44]    *Christopher D.*, 426 P.3d at 1123 (alteration in original) (quoting Alaska R. Civ. P. 90.3 cmt. I.B).

[45]    *Amy S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 440 P.3d 273, 282 (Alaska 2019).

his father to testify about — that Troy had helped care for his parents. The court accepted that fact as true, though deciding that it did not excuse Troy's underemployment. Troy does not explain how his father's testimony would have advanced his argument.

The improper admission of evidence is reversible error "only if . . . we are left with a definite and firm conviction that the trial court erred in its ruling and the error affected the substantial rights of a party."[46] Troy does not explain how his substantial rights were affected by the court's alleged errors in the application of the hearsay rule. We also see no disadvantage to Troy in the court's consideration of the parties' relative health constraints. The court considered the parties' age and health as one of the *Merrill* factors, as it was required to do by statute,[47] implicitly weighed the factor in Annette's favor,[48] but ultimately found that Annette had a higher future earning capacity that justified an initial 60/40 property division in Troy's favor.

Finally, as for the court's reliance on an exhibit that was admitted only for demonstrative purposes, there is no error. In the court's discussion of the *Ramsey* credit it cited Annette's exhibit listing expenses she claimed to have paid on Troy's behalf. Although the exhibit had been "admitted for demonstrative purposes only," Annette testified extensively about the listed expenses at trial, and the court's reference to the

---

[46]     *Dobos v. Ingersoll*, 9 P.3d 1020, 1023 (Alaska 2000).

[47]     AS 25.24.160(a)(4) (requiring court to "fairly allocate the economic effect of divorce" by considering "the age and health of the parties" among other factors).

[48]     The superior court found that Annette's "health will limit her ability to work in the future" but that "there is no evidence that [Troy's] ability to work is limited by his [health issues]."

demonstrative exhibit as a convenient summary was consistent with the purpose of its admission.[49]

## V.    CONCLUSION

The superior court's property division order is VACATED and REMANDED for further proceedings consistent with this opinion.  The superior court's child support order is AFFIRMED.

---

[49]    "Physical evidence that one can see and inspect (i.e. an explanatory aid, such as a chart, map, and some computer simulations) and that, while of probative value and usu[ally] offered to clarify testimony, does not play a direct part in the incident in question." *Evidence — demonstrative evidence*, BLACK'S LAW DICTIONARY (11th ed. 2019).