NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| DANIEL D. BUTTS, | ) Supreme Court No. S-18367 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-19-11292 CI |
| v. | ) |
| | ) MEMORANDUM OPINION |
| | ) AND JUDGMENT* |
| KATHERINE L. LEMASTER, | ) |
| | ) No. 2017 – March 6, 2024 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Peter R. Ramgren, Judge.

Appearances: Daniel D. Butts, pro se, Anchorage, Appellant. No appearance by Appellee Katherine L. LeMaster.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I. INTRODUCTION

A husband and wife divorced after ten years of marriage. Following a trial, the superior court divided the marital property 60/40 in favor of the wife and awarded her a year of rehabilitative alimony. The court also ordered the husband to pay a $5,000 sanction and attorney's fees incurred as a result of the husband's

---

\* Entered under Alaska Appellate Rule 214.

unauthorized sale of the marital home, which the court had found to be an act of contempt. The husband challenges these rulings.

We conclude that the superior court did not abuse its discretion in its division of the marital estate, its award of rehabilitative alimony, or its contempt sanction. However, because of minor discrepancies in the attorney's fees award, we vacate that award and remand for further reconsideration of the issue.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

#### 1.     Background of the marriage and separation

Katherine LeMaster and Daniel Butts married in 2009, and until 2018 they lived in a home they bought together in Seward. Butts worked primarily as a tugboat captain, making roughly $120,000 a year; LeMaster was trained in the food and beverage industry and had a number of jobs in that field. In 2016 Butts began training to be a marine pilot, an occupation with the potential to significantly increase his income.

The couple bought a restaurant together in 2012. LeMaster worked in the restaurant full time; Butts worked there full time for one or two years before returning to his career as a tugboat captain. But the restaurant was never profitable, and in 2017 the couple closed it and filed for corporate bankruptcy. It soon became apparent that they owed a substantial amount in back payroll taxes due to mismanagement by their bookkeeper; one consequence was an IRS lien on their home. They filed for personal bankruptcy in early 2018. Butts continued to work as a tugboat captain, and LeMaster worked various seasonal jobs in the food service industry, first in Seward and then in Bellingham, Washington. The couple separated in August 2019 and LeMaster filed for divorce that November.

At the start of the COVID-19 pandemic, LeMaster was laid off from her job waiting tables at an Anchorage restaurant. For a year after that she received unemployment benefits of about $300 per week. In June 2020 she opened a coffee

kiosk in Seward. She testified that she spent about $5,000 to start the business and broke even the first season (June to September 2020), though she was unable to pay herself a salary. She testified that she expected the coffee business to do better in future summers due to the waning of the pandemic and the return of tourism, but still she expected to make less than $18,000 her first year. She hoped to begin a catering business too, though she estimated it would need almost $100,000 in startup capital. She testified that at age 42 she had $2,500 in savings and no retirement funds.

Butts continued to work as tugboat captain and at the time of trial was still working toward his marine pilot's license.

### 2. The parties' assets and debts

Butts's and LeMaster's primary assets were their marital home, valued between $300,000 and $330,000 and subject to the tax lien, and Butts's 401(k) retirement account, which at the time of separation contained $60,755.87. A few months after separation Butts took out a loan from the 401(k) in the amount of $30,942.64, which he deposited into his checking account; he later testified that this money went toward marital bills and a new transmission for his truck. A year later, after divorce proceedings had begun, he withdrew $36,000 from the account in the form of a coronavirus-related relief distribution,[1] depositing that money into his bank account as well. He testified that he used this money for overdue mortgage payments on the marital home.

The amount of tax debt from the unpaid payroll taxes — the subject of the lien on the parties' home — was disputed at trial, but Butts and LeMaster ultimately agreed on $132,276.65.

---

[1] Under the CARES Act, qualified individuals were permitted to take distributions from their retirement accounts up to $100,000 without penalty during 2020. *See Coronavirus-related relief for retirement plans and IRAs questions and answers*, IRS, https://www.irs.gov/newsroom/coronavirus-related-relief-for-retirement-plans-and-iras-questions-and-answers (last visited Feb. 20, 2024).

### B. Proceedings

#### 1. Divorce and property division proceedings

The superior court held a trial in March 2021, at which only Butts and LeMaster testified. LeMaster testified that Butts managed the money during their marriage and paid most of the bills. She discussed her financial situation and her struggles to maintain consistent employment in the food service industry during the pandemic. She also testified about the coffee kiosk, the catering business she planned to start, and these ventures' anticipated costs and revenues.

Butts testified about his financial situation, his withdrawals from his 401(k) account, and other expenditures he had made since separation. He testified that he wanted to keep the marital home.

#### 2. Contempt proceedings

The divorce proceedings were from the start subject to a standard Domestic Relations Initial Order, mandating, among other things, that "[u]nless the opposite party agrees in writing, OR this court orders it: . . . you cannot sell or dispose of any marital or disputed property." In September 2021 Butts sold the marital home without LeMaster's knowledge or a court order. He used the sale proceeds to pay off the couple's tax debt, with about $27,000 left over. The court ordered Butts's attorney to hold that money in escrow pending a final property division; the attorney pledged to tell his client that the leftover funds had to be "deposited into [the attorney's trust] account as soon as possible" and "if it's not the full $27,000 amount, [the attorney would] let the court know why that is." The court scheduled a show cause hearing to determine whether Butts should be held in contempt for his violation of the initial order.

The court held the show cause hearing in January 2022. Butts testified that he was unaware of the court order not to unilaterally dispose of marital assets and that he had not consulted with his attorney about the sale beforehand. He explained that he began the process of selling the house in August 2021 and sold it the next month for

$350,000. He testified that after the tax lien was satisfied he had $27,466 remaining, which he deposited in his savings account.

But Butts also testified that much of that money was gone before he was ordered to transfer it to the care of his attorney. In October 2021 he withdrew $10,000 and accidentally put it in his girlfriend's checking account instead of his own. He explained that she returned only $9,000 because he owed her $1,000 in rent. He then withdrew another $10,000 to buy cryptocurrency, hoping for a quick profit. But the gambit failed and Butts lost money; his cryptocurrency investment was worth $3,664.43 at the time of the contempt hearing. By the time he was ordered to put the funds in his attorney's trust account, only around $16,000 from the house sale remained. He testified that although he knew that these funds were marital, he did not realize the court order barred him from using them.

The court expressed frustration with Butts's action, noting his trial position that he wanted to keep the marital home for himself. According to the court, it had nonetheless been prepared to order the home's sale in order to satisfy the tax lien, so if Butts had simply asked permission it likely would have been granted: "[T]hat's the frustrating part, is that there was no need for you to disobey the court order." But Butts testified that it was his frustration with LeMaster and the court that deterred him from asking for their permission; he felt justified in acting unilaterally because he believed a sale was best for both LeMaster and himself. The court ultimately found him in contempt, reserving the issue of sanctions for its final order.

### 3. The final property division order

The court issued its final order dividing the marital estate in February 2022, ordering a 60/40 division in favor of LeMaster. To support this division the court examined the factors set out in AS 25.24.160(a)(4) and our holding in *Merrill v.*

*Merrill*.[2]  While its analysis of most of the *Merrill* factors did not appear to favor one party or the other, its analysis of three of them — the parties' respective earning capacities, financial positions, and conduct — highlighted the differences in the parties' economic situations.

The court found that Butts's earning capacity was reflected in his steady employment as a boat captain working towards his marine pilot license, which, once obtained, had the potential to significantly increase his income.  As for LeMaster, the court found that she had suffered career setbacks due to the pandemic, like many others

---

[2]  *See* 368 P.2d 546, 547-48 n.4 (Alaska 1962).  The so-called *Merrill* factors are:

(A)   the length of the marriage and station in life of the parties during the marriage;

(B)   the age and health of the parties;

(C)   the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;

(D)   the financial condition of the parties, including the availability and cost of health insurance;

(E)   the conduct of the parties, including whether there has been unreasonable depletion of marital assets;

(F)   the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;

(G)   the circumstances and necessities of each party;

(H)   the time and manner of acquisition of the property in question; and

(I)   the income-producing capacity of the property and the value of the property at the time of division.

*See id.*; AS 25.24.160(a)(4).

in the food and beverage industry, but her education and experience would likely lead to an increase in her earnings over time. Butts's steady employment meant that LeMaster, with her fledgling business ventures, was "in a significantly less advantageous [financial] position." The court recognized her attempts to live frugally so that whatever "minimal" income she got from the coffee kiosk could be put into the catering business, but it also noted that she would have to purchase her own health insurance, costing her between $800 and $900 per month.

When examining the conduct of the parties, the court agreed with LeMaster that Butts's $36,000 withdrawal from his 401(k) after their separation was an improper depletion of marital funds. The court ordered that any funds not used for marital purposes be recaptured by valuing the account "pre-depletion" and crediting it to Butts. The court also recognized Butts's act of contempt in unilaterally selling the marital home, ordering him to pay a $5,000 fine and the attorney's fees LeMaster had incurred in litigating the issue.

The court then addressed spousal support. Though recognizing that it is generally disfavored, the court ordered Butts to pay LeMaster rehabilitative alimony in the amount of $1,500 per month for 12 months, citing LeMaster's need for "continuing support to assist in her advancement as a food and beverage professional" and Butts's financial advantages.

Butts appeals.

## III.    STANDARD OF REVIEW

"We review [equitable allocation of the property] under the abuse of discretion standard. We will not disturb the trial court's allocation unless it is clearly unjust."[3] "The court abuses its discretion if it 'considers improper factors, fails to

---

[3]    *Partridge v. Partridge*, 239 P.3d 680, 685 (Alaska 2010) (citations omitted).

consider statutorily mandated factors, or gives too much weight to some factors.' "[4] We review the superior court's findings of fact under the *Merrill* factors for clear error.[5] "Trial courts' . . . awards of spousal support are reviewed for abuse of discretion; we reverse such awards only if they are clearly unjust."[6]

We review a trial court's decision to impose civil contempt sanctions for abuse of discretion, but we review the underlying factual findings for clear error.[7] "[W]e review de novo a superior court's decision to hold someone in contempt pursuant to Alaska Civil Rule 90(b) . . . ."[8]

Finally, "[w]e review an award of attorney's fees under an abuse of discretion standard."[9] However, the trial court "must make sufficient findings to permit meaningful review of an attorney's fees award."[10] While "[a]n absence of explicit findings is not necessarily fatal," there must be a clear basis for the award to allow appellate review.[11]

---

**4**    *Rohde v. Rohde*, 507 P.3d 986, 991 (Alaska 2022) (quoting *Thompson v. Thompson*, 454 P.3d 981, 995 (Alaska 2019)).

**5**    *Hudson v. Hudson*, 532 P.3d 272, 278 (Alaska 2023).

**6**    *Urban v. Urban*, 314 P.3d 513, 515 (Alaska 2013) (quoting *Barnett v. Barnett*, 238 P.3d 594, 597 (Alaska 2010)).

**7**    *Matanuska Elec. Ass'n v. Rewire the Bd.*, 36 P.3d 685, 690 & n.4 (Alaska 2001) ("This court will reverse a trial judge's decision regarding contempt only if it is without evidentiary support or is an abuse of discretion." (quoting *Dale v. Dale*, 534 S.E.2d 705, 707 (S.C. App. 2000))).

**8**    *Stuart v. Whaler's Cove, Inc.*, 144 P.3d 467, 469 (Alaska 2006).

**9**    *Oakly Enters., LLC v. NPI, LLC*, 354 P.3d 1073, 1079 (Alaska 2015) (quoting *Ware v. Ware*, 161 P.3d 1188, 1192 (Alaska 2007)).

**10**    *State v. Schmidt*, 323 P.3d 647, 668-69 (Alaska 2014) (remanding trial court's award of attorney's fees under Rule 82 and statute for constitutional claimants because award was too vague to allow appellate review).

**11**    *Id.* at 668.

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion In Its 60/40 Division Of The Marital Estate.

Butts disputes the superior court's findings on three *Merrill* factors which appear to favor LeMaster: the parties' earning capacity, their financial positions, and their conduct.[12] He also disputes the court's finding that factor (H) — "the time and manner of acquisition of the property in question"[13] — was neutral, arguing that it should have weighed in his favor. But seeing no clear error in the court's factual findings or abuse of discretion in its ultimate property division, we affirm its order.

#### 1. The superior court did not abuse its discretion in weighing factor (C), the parties' earning capacity.

Butts argues that the superior court erred in its analysis of the third *Merrill* factor, earning capacity, when it found that his would "increase significantly" once he obtained his marine pilot's license; he argues that this finding put too much weight on a job he did not yet have. But the difference in the parties' earning capacities is well supported in the record. Butts testified about his tugboat captain's salary — consistently in excess of $100,000 — and his marine pilot training. LeMaster testified about her education and background in the food service industry, the fact that her highest-paying job had earned her $18 an hour, and her difficulty making any money in new business ventures that made use of her training and experience given the pandemic-related setbacks and start-up costs.

The superior court's findings about the parties' earning capacities are firmly grounded in this testimony and are not clearly erroneous. Even without speculation about Butts's income if and when he became a licensed marine pilot, his earning capacity clearly exceeded LeMaster's. The court did not abuse its discretion in its weighing of this factor.

---

[12]    AS 25.24.160(a)(4)(C), (D), (E).

[13]    AS 25.24.160(a)(4)(H).

**2.** **The superior court did not abuse its discretion in weighing factor (D), the parties' financial positions.**

Butts argues that the superior court erred when it found that the fourth *Merrill* factor, the parties' financial positions,[14] also favored LeMaster. He argues that the court erred by failing to consider the significant expenses that offset his higher income and by ignoring the facts that LeMaster lived with her parents rent-free, "turned down work[,] and travelled extensively while [the parties] waited for trial."

Again, we see no clear error in the court's fact-finding and no abuse of discretion in its weighing of this factor. The court took note of the parties' tax debt, just "recently discharged" by the sale of their home, and their few other assets besides Butts's retirement account. The court contrasted Butts's "steady employment" at a good salary, with healthcare benefits, with LeMaster's "less advantageous position" owning the coffee kiosk and hoping to build a "new catering venture" in which she was investing her coffee proceeds. The court noted LeMaster's minimal income and her predicted health insurance costs.

The court did acknowledge LeMaster's living situation.[15] And as Butts points out, she did testify that she had taken vacation trips during the past few years, for which she said she "paid for incidentals"; but this topic was not explored any further at trial. We cannot say that either LeMaster's living situation or her unspecified vacation expenses necessarily detract from the court's overall conclusion: that she was living relatively frugally while trying to launch a new business in the only field for which she was trained and which would require considerably more investment in the years to come. The court did not abuse its discretion in its weighing of this factor.

---

[14]     AS 25.24.160(a)(4)(D).

[15]     The court found that LeMaster was "living with her parents." We read her testimony as saying that she was living rent-free in a townhome owned by her parents, sharing it with a roommate who paid some of the expenses. The difference has no significance in our analysis.

### 3. The superior court did not abuse its discretion in weighing factor (E), the parties' conduct.

Butts argues that the court also erred in its analysis of the fifth *Merrill* factor, which considers the conduct of the parties and whether there has been unreasonable depletion of marital assets.[16] Misconduct in this context includes economic misconduct but not moral or legal misconduct.[17] Analysis of the issue generally considers three elements: "(1) use of marital property for the spouse's own benefit; (2) at a time when the marriage is breaking down (either before or after separation); and (3) an intent to deprive the other spouse of their share of the marital property."[18] "Not all factors must be present in every case, but the intent to deprive is usually present."[19]

The superior court's analysis of factor (E) focused on two things: first, Butts's withdrawal of $36,000 from his 401(k) after separation, which was a depletion of marital assets; and second, his unilateral sale of the marital home in violation of the court's order, which was an act of contempt. The conduct at issue is clearly economic, and Butts does not argue otherwise. He contends, however, that his withdrawal of money from the retirement account should not have been weighed against him because he used it to make overdue mortgage payments on the marital home. The court, in weighing this factor in favor of LeMaster, qualified its conclusion: "To the extent that funds taken from the account post-separation were not used for marital purposes, they are recaptured . . . ." The court made no additional findings on this subject.

Nonetheless, the record supports the court's decision to consider this conduct to be a depletion of marital assets. Butts provided no evidence besides his own

---

[16] AS 25.24.160(a)(4)(E).

[17] *Jones v. Jones*, 942 P.2d 1133, 1139 (Alaska 1997).

[18] *Hudson v. Hudson*, 532 P.3d 272, 281 (Alaska 2023).

[19] *Id.* (citation omitted).

testimony about the use of the funds he withdrew from the 401(k). But the relevant bank statements cast doubt on this testimony, showing a deposit of $36,000 into his checking account in October 2020 followed by thousands of dollars in debits and withdrawals for various expenses, none of which are denominated as mortgage payments. And while Butts argues that this factor focuses on conduct during marriage, we apply it as well to the handling of marital property and debts after separation.[20] Concluding that Butts's withdrawal of funds from the 401(k) was economic misconduct was not error.

Nor was it error for the court to find economic misconduct in Butts's unilateral sale of the marital home and improper use of the sale proceeds. We have held that unilaterally selling a marital asset in violation of a court order is a relevant factor in determining economic misconduct.[21] Butts not only sold the home in violation of the court order, he also used the proceeds for his own benefit without regard to their status as marital property.

Finally, Butts argues that the superior court erred by declining to give him credit in the final accounting for several other categories of post-separation expenses: interim spousal support payments and payments to maintain the marital home and LeMaster's car. We have recognized that "[t]rial courts are required to consider payments made from one party's post-separation income to preserve marital assets, but are not required to give credit for such payments in the final property division."[22] The

---

[20]   *Heustess v. Kelly-Heustess*, 259 P.3d 462, 476-77 (Alaska 2011) ("[W]e consistently have considered the conduct of the parties with respect to the marital property and debts after separation a relevant factor in determining a just division.").

[21]   *See Hockema v. Hockema*, 403 P.3d 1080, 1085, 1094 (Alaska 2017) (noting trial court's recognition of economic misconduct in spouse's sale of marital property in violation of court order); *see also Hudson*, 532 P.3d at 282 (recognizing "disobey[ing] a court order relating to marital property" as a "factor[] typically important to evaluating claims of economic misconduct").

[22]   *Conner v. Conner*, 68 P.3d 1232, 1238 (Alaska 2003); *id.* ("This court has stated that 'no fixed rule requiring credit in all cases should be imposed. Instead . . .

court's order shows that it considered these payments, as it was required to do. But because it had no obligation to give Butts credit for them in the final accounting, it did not abuse its discretion by declining to do so under the circumstances.[23]

### 4. The superior court did not abuse its discretion in weighing factor (H), the time and manner of the acquisition of property.

Butts argues that the superior court erred when it failed to find the eighth *Merrill* factor, which examines "the time and manner of acquisition of the property in question," in his favor.[24] He argues that the factor should have favored him, considering that the couple's only significant asset, the home, was titled in his name because he "paid all the bills of the marriage and [LeMaster] had bad credit." We assume from the court's brief discussion of this factor that it found it to favor neither party; this was within the court's discretion. As the court observed, Butts conceded that the home was marital even though it was titled solely in his name. The fact that he was the couple's primary breadwinner did not require the court to view the asset any differently.[25] The court did not abuse its discretion when it failed to weigh this factor in Butts's favor.[26]

---

payments from non-marital income to preserve marital property should be considered as one of the circumstances to be weighed by the trial court in dividing the marital property.' " (alteration in original) (quoting *Ramsey v. Ramsey*, 834 P.2d 807, 809 (Alaska 1992))).

[23]    *See, e.g.*, *Brennan v. Brennan*, 425 P.3d 99, 111 (Alaska 2018) (concluding it was not abuse of discretion for superior court to order $5,000 per month in interim spousal support and not credit paying party for alleged overpayments of spousal support).

[24]    AS 25.24.160(a)(4)(H).

[25]    *See, e.g.*, *Bussell v. Bussell*, 623 P.2d 1221, 1223 (Alaska 1981) (holding that "courts making property divisions should consider each spouse's relative contributions to the marriage," and although one partner's "role in the marriage was primarily domestic, . . . this was apparently a role decided on by the parties jointly, and should be recognized as a valuable contribution to the marital enterprise").

[26]    *See Chotiner v. Chotiner*, 829 P.2d 829, 835 (Alaska 1992) (holding that trial court's refusal to give husband credit for his down payment on marital home was

**B.    The Superior Court Did Not Abuse Its Discretion By Ordering Rehabilitative Spousal Support.**

Rehabilitative alimony "is awarded for a short duration and a specific purpose limited to job training or other means directly related to entry or advancement within the work force"[27] in order that "the recipient spouse [may] 'secur[e] . . . a source of earned income.' "[28]  The superior court must find that such an award is "just and necessary,"[29] "predicated on specific, time-limited educational or career goals,"[30] and supported by findings about the "financial needs and abilities of both parties."[31]  "The party seeking rehabilitative alimony should present an educational or job training plan so that the reviewing court can determine whether a support award is necessary and appropriate."[32]  Butts contends that the superior court's award of rehabilitative alimony to LeMaster — $1,500 per month for 12 months — failed to meet these requirements.

We disagree.  LeMaster testified extensively about planned improvements to her coffee kiosk and her start-up plans for the catering business, including necessary equipment, transportation issues, and approximate dollar amounts.  Considering her financing needs, LeMaster anticipated starting the catering business the year after trial.  The superior court could reasonably find that due to her age, training, and experience,

---

not abuse of discretion; noting that "we have not held that failing to make such an adjustment is an abuse of discretion").

[27]    *Hixson v. Sarkesian*, 66 P.3d 753, 760 (Alaska 2003) (internal quotations omitted) (quoting *Musgrove v. Musgrove*, 821 P.2d 1366, 1369 (Alaska 1991)).

[28]    *Myers v. Myers*, 927 P.2d 326, 329 (Alaska 1996) (second alteration in original) (quoting *Schanck v. Schanck*, 717 P.2d 1, 5 (Alaska 1986)).

[29]    AS 25.24.160(a)(2).

[30]    *Fernau v. Rowdon*, 42 P.3d 1047, 1059 (Alaska 2002).

[31]    *See* AS 25.24.160(a)(2); *Davila v. Davila*, 876 P.2d 1089, 1094 (Alaska 1994) (indicating that adequate findings on financial abilities of both parties are required in all awards of alimony).

[32]    *Tybus v. Holland*, 989 P.2d 1281, 1288 (Alaska 1999).

the only field in which she would have well-paid employment opportunities was the food and beverage industry.[33]  And further, it could reasonably conclude that her business plans fit within our definition of rehabilitative alimony as supporting "job training or other means directly related to entry or advancement within the work force."[34]  The court's conclusion that "LeMaster will need continuing support to assist in her advancement as a food and beverage professional" is supported by the evidence.

The superior court also made sufficient findings about the parties' financial situations,[35] as discussed above, concluding not just that LeMaster needed the support but also that Butts was capable of paying it.  The superior court has wide discretion in making alimony determinations.[36]  We see no abuse of discretion here.

### C.    The Contempt Sanction Was Not An Abuse of Discretion.

Butts acknowledges that his act of selling the house in violation of the Domestic Relations Initial Order was an act of contempt; however, he nonetheless argues that it did not justify a $5,000 sanction because of the size of the marital estate and the fact that the sale was intended to — and did — result in satisfaction of the parties' shared IRS debt.  But we conclude that the court acted well within its discretion in imposing the sanction.

Alaska Statute 09.50.010 provides several examples of acts of contempt, including "disobedience of a lawful judgment, order, or process of the court."[37]  Penalties are also set out in statute:  AS 09.50.020 provides that "[a] person who

---

[33]    *See Nicholson v. Wolfe*, 974 P.2d 417, 426 (Alaska 1999) (upholding denial of rehabilitative alimony when spouse "had significant education, skills, and experiences that would make him employable in several job markets").

[34]    *Davila*, 876 P.2d at 1094 (quoting *Richmond v. Richmond*, 779 P.2d 1211, 1215 (Alaska 1989)).

[35]    *See Hockema v. Hockema*, 403 P.3d 1080, 1089 (Alaska 2017).

[36]    *Fernau v. Rowdon*, 42 P.3d 1047, 1058-59 (Alaska 2002).

[37]    AS 09.50.010(5).

commits a civil contempt is subject to damages, a civil penalty of $5,000 or less for each violation, and other orders as the court finds appropriate."[38] Butts's unilateral act was a clear violation of the order not to dispose of marital assets without LeMaster's written agreement or court order. Butts acknowledged the contemptuous nature of his conduct at the contempt hearing, as he does on appeal, but he continued to justify it as not just financially sound but also necessary because of LeMaster's unwillingness to cooperate and his frustration with the court proceedings.

The court found that, contrary to Butts's testimony, he must have been aware that he was not supposed to sell marital property unilaterally, and his violation of the order was therefore knowing. The court also rejected Butts's arguments that his conduct — acting without authority — was justified. While the $5,000 sanction was the harshest allowed under AS 09.50.020, we cannot conclude that it was outside the limits of the court's discretion given its findings of a knowing violation and a lack of real remorse.

**D.     The Award Of Attorney's Fees For Butts's Act Of Contempt Requires Reconsideration On Remand.**

The court's final order dividing the marital property required the parties to be responsible for their own attorney's fees and costs, with one exception: Butts had to "pay 100% of Ms. LeMaster's attorney's fees that were necessarily incurred as a direct result of his misconduct." LeMaster submitted a "statement of attorney's fees and expenses" described as "a true and correct statement of the fees actually and reasonably accrued since November 2, 2021, when Defendant's counsel first notified Plaintiff's counsel that Defendant sold the house without leave of the court." LeMaster's attorney represented that "[a]ll of the attorney and paralegal time, totaling $9,137.50, expended by Plaintiff on and after that date was made necessary by

---

[38]     AS 09.50.020(a).

Defendant's act of contempt and the response thereto." The court found the claimed fees reasonable and ordered Butts to pay LeMaster $9,015.

Butts challenges the attorney's fees award, and we agree that it must be vacated and remanded for reconsideration for two reasons: first, it is not clear to us that the fees awarded all related to the act of contempt, as the court contemplated; and second, there is an unexplained (though minor) difference between the fees claimed and the fees awarded, notwithstanding the court's statement that "the requested fees are reasonable."

First, there are several time entries by both LeMaster's attorney and her paralegal that record work on a joint property spreadsheet. Drafting this spreadsheet was a task that had been ongoing throughout the litigation and was the subject of a hearing on November 3, 2021, the day after LeMaster learned of Butts's sale of the home. Neither party mentioned the act of contempt at that hearing; the motion to show cause was heard three weeks later. In the spreadsheet attached to the final property division order, both parties retained their original valuations of the marital home, estimated the remaining mortgage, and noted their agreed estimate of the tax debt. While it is possible that the property spreadsheet had to be modified in response to Butts's sale of the house, that is not reflected in our record, and we have no basis on which to attribute the time spent on this issue to Butts's act of contempt.

Second, we note that although the court specifically found LeMaster's claimed fees of $9,137.50 reasonable, it awarded $122.50 less than that, without explanation. While the reason for the difference may be in the time spent on the property division spreadsheet as noted above, we cannot tell from the record, and therefore, in addressing Butts's challenge, we cannot determine the reasonableness of the sum awarded.[39] The court should revisit the issue on remand.

---

[39] *See State v. Schmidt*, 323 P.3d 647, 668 (Alaska 2014) (holding in context of attorney's fees under Civil Rule 82 and statute for constitutional claimants that "[a]

## V. CONCLUSION

We AFFIRM the superior court's order dividing the marital estate and ordering rehabilitative alimony and sanctions for contempt. We VACATE the attorney's fees award and REMAND for reconsideration in light of this decision.

---

court must make sufficient findings to permit meaningful review of an attorney's fees award").